UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

---

RAYMOND SEVERSON
501 South Main Street
West Bend, Wisconsin 53095

      Plaintiff,

      v.                             Case No.: 14-CV-1141

HEARTLAND WOODCRAFT, INC.       **JURY TRIAL DEMANDED**
529 North River Road
West Bend, Wisconsin 53090

      Defendant.

---

## COMPLAINT

---

COMES NOW Plaintiff, Raymond Severson, by his counsel, WALCHESKE & LUZI, LLC, as and for a claim against Defendant, alleges and shows to the court as follows:

1. This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this case involves a federal question under the Americans with Disabilities Act ("ADA"), as amended by the Americans with Disabilities Act Amendments Act of 2008 ("ADAAA"), 42 U.S.C. §§ 12101, *et. seq.*, and the Family and Medical Leave Act of 1993, as amended, 29 U.S.C. §§ 2601, *et seq.* ("FMLA").

2. The unlawful employment practices of which Plaintiff complains occurred within the Eastern District of Wisconsin and therefore venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c).

3. Plaintiff, Raymond Severson, is an Adult male resident of the State of Wisconsin residing in Washington County with a post office address of 501 South Main Street, West Bend, Wisconsin 53095.

4. Defendant, Heartland Woodcraft, Inc., was, at all material times herein, a Wisconsin corporation with a principal office address of 529 North River Road, West Bend, Wisconsin 53090.

## Mr. Severson's Employment at Defendant

5. In approximately the year 2006, Defendant hired Mr. Severson as a Supervisor.

6. Subsequent to hiring Mr. Severson in approximately the year 2006 as a Supervisor, Defendant promoted him to the position of Superintendent.

7. In Mr. Severson's position as Superintendent with Defendant, he reported directly to Roy DeSimone, Operations Manager.

8. In approximately January 2012, Defendant promoted Mr. Severson to the position of Operations Manager.

9. In Mr. Severson's position as Operations Manager with Defendant, it compensated him with an annual salary of approximately $64,500 plus other employment benefits.

10. In Mr. Severson's position as Operations Manager with Defendant, his customary or usual hours of work were Monday through Friday, 4:30 a.m. to 3:30 p.m.

11. In Mr. Severson's position as Operations Manager with Defendant, he reported directly to Patrick Koness, Owner.

12. In approximately May 2012, Defendant hired Doug Lawrence as General Manager.

13. Subsequent to Defendant's hire of Lawrence as General Manager in approximately May 2012, Mr. Severson reported directly to Lawrence and Lawrence reported directly to Koness.

14. Mr. Severson's last day of work at Defendant was on or about June 5, 2013.

15. On or about June 7, 2013, Defendant demoted Mr. Severson from Operations Manager to the position of Second Shift Lead.

16. In Mr. Severson's position with Defendant as Second Shift Lead, Defendant would compensate him at an hourly rate of $22.00 per hour, at least 40 hours per week, and would allow Mr. Severson to work a maximum of one (1) hour per day more than the other employees in Defendant's "shop" area at an overtime rate of pay (time and one-half).

### Mr. Severson's Back Disability, Mr. Severson's Previous Leave From Defendant, and Respondent's Knowledge of Same

17. For the last five or ten years, Mr. Severson has suffered from back injuries.

18. Since at least the year 2011, Mr. Severson has suffered from back myelopathy caused by impaired functioning and degenerative changes to his back, neck, and/or spinal cord (hereinafter "Mr. Severson's back disability").

19. Mr. Severson's back disability is a permanent, physical health condition.

20. Mr. Severson has received pain injections, prescription medication, and physical therapy as a result of his back injury.

21. Mr. Severson's back disability negatively and substantially limits his ability to move, walk, bend, lift, sit, stand, and work.

22. Mr. Severson's back disability negatively and substantially limits the normal functioning of his neurological and/or musculoskeletal system as relates to his back, neck, legs, and spinal cord.

23. In approximately the year 2011, Mr. Severson injured his back at Defendant as a result of a work-related injury.

24. When Mr. Severson injured his back at Defendant as a result of a work-related injury in approximately the year 2011, it exacerbated/caused his back disability.

25. Shortly after Mr. Severson injured his back at Defendant as a result of a work-related injury in approximately the year 2011, Defendant allowed Mr. Severson to work from home.

26. Shortly after Mr. Severson injured his back at Defendant as a result of a work-related injury in approximately the year 2011, Defendant allowed Mr. Severson to return to work by telling him to simply return to work and it would find "light duty" work for him to do, such as supervising, inventory, bagging screws, product checks, counting product, ordering, scheduling, and doing data entry, paperwork, and computer work.

27. Shortly after Mr. Severson injured his back at Defendant as a result of a work-related injury in approximately the year 2011, Defendant allowed Mr. Severson to return to work to stop or limit the workers' compensation payments Mr. Severson was receiving.

28. From approximately the years 2010 through 2013, Defendant knew that Mr. Severson suffered from a back disability and often did not want or require him to perform any heavy lifting at the risk of further injuring his back. For example, Defendant would tell Mr. Severson, "Don't lift anything while loading these trucks," or words to that effect, when performing his job duties or job responsibilities.

**Respondent's "100% Healed" Policy and Treatment of Other Employees**

29. During Mr. Severson's employment with Defendant, it maintained, communicated, and enforced an unwritten policy, requiring an employee who was on a leave of absence for a non-work-related injury (not workers' compensation related) to provide to Defendant, before Defendant allowed the employee to return to work, a physician's slip or certification stating that the employee could return to work "without restrictions," or that the employee was "100% healed" from his or her medical condition or injury (hereinafter, Defendant's "100% healed policy").

30. During Mr. Severson's employment with Defendant and in his position as Operations Manager, Defendant, specifically Koness and/or Lawrence, instructed or directed Mr. Severson to inform other employees at Defendant who had non-work related injuries, such as a former employee named Chris Webb, that they could not return to work at Defendant from their non-work related injuries until they could return at "full capacity" or without any work restrictions.

31. During Mr. Severson's employment with Defendant, it occasionally and at its sole discretion made exceptions to its "100% healed policy" when it felt sorry for employees, like Steve Kulinski (cancer) and Ed Kurzinski (physical injuries), who were on a leave of absence from Defendant for a non-work-related injury (not workers' compensation related).

32. In situations where Defendant made an exception to its "100% healed policy," Defendant's standard practice was to allow employees to return to work with restrictions and to then find a "light duty" position for these employee to fill, or even simply to create "light duty" work for these employee to perform, such as supervising, inventory, bagging screws, product checks, counting product, ordering, scheduling, data entry, paperwork, and computer work.

## Mr. Severson's Leave From and Termination By Defendant

33. On or about June 5, 2013, Mr. Severson injured his back while at work at Defendant.

34. Although Mr. Severson injured his back while at work at Defendant on or about June 5, 2013, Mr. Severson's injury was considered non-work-related.

35. Although Mr. Severson injured his back while at work at Defendant on or about June 5, 2013, Mr. Severson did not file or pursue a workers' compensation claim.

36. When Mr. Severson injured his back on or about June 5, 2013, it exacerbated, aggravated, and further injured Mr. Severson's back disability.

37. On or about June 5, 2013, Lawrence and Koness were informed that Mr. Severson was experiencing back pain and that he injured his back.

38. On or about June 5, 2013 and subsequent to exacerbating, aggravating, and further injuring his back disability, Koness told Mr. Severson to go home for the day so that he would not injure his back further.

39. On or about Monday, June 10, 2013, Defendant was informed that Mr. Severson was continuing to experience back pain and would likely be off of work at Defendant for the remainder of the week.

40. On or about June 10, 2013, Lawrence spoke with Mr. Severson via telephone ("the June 9, 2013/ June 10, 2013 phone conversation").

41. During the June 10, 2013 phone conversation, Lawrence told Mr. Severson that Defendant would not allow Mr. Severson to return to work from his leave of absence leave with work restrictions.

42. During the June 10, 2013 phone conversation, Lawrence told Mr. Severson that Defendant would allow Mr. Severson to return to work from his leave of absence only when he could "come back at full capacity," or words to that effect.

43. In approximately mid-June 2013, Jennifer Schroeder, Office/Customer Service Manager, sent Mr. Severson an FMLA leave request form, a notice of his FMLA rights, and a Health Care Certification to be completed by Mr. Severson's physician and returned to Defendant.

44. In June or July 2013, Defendant received Mr. Severson's completed FMLA leave request form, signed by Mr. Severson and dated June 26, 2013.

45. Mr. Severson's completed FMLA leave request form stated that his FMLA leave was for his "own serious illness."

46. Mr. Severson's completed FMLA leave request form stated that his FMLA leave would be for twelve weeks and would begin on June 5, 2013.

47. Mr. Severson's completed FMLA leave request form stated, under the heading, "Date employee will return," that Mr. Severson would return to work at Defendant on September 18, 2013.

48. During Mr. Severson's employment with Defendant, EPIC Life Insurance ("EPIC") was Defendant's disability insurance carrier.

49. During Mr. Severson's employment with Defendant, EPIC was an agent of Defendant.

50. During Mr. Severson's employment with Defendant, Defendant authorized EPIC to act on its behalf regarding administration and determination of Defendant's employee's disability insurance.

51. In July 2013, Defendant and/or EPIC received a document titled, "Short Term Disability Claim Form – Update" on behalf of Mr. Severson completed by James P. Hollowell, Mr. Severson's treating physician, and dated July 2, 2013.

52. The "Short Term Disability Claim Form – Update" that Defendant and/or EPIC received in July 2013 on behalf of Mr. Severson stated that Mr. Severson's diagnosis was "Lumbar/lumbosacral disc degeneration."

53. The "Short Term Disability Claim Form – Update" that Defendant and/or EPIC received in July 2013 on behalf of Mr. Severson stated that Mr. Severson was prescribed the following medication(s): "Oxycodone-acetaminophen," "Valium," and "Epidural steroid injections."

54. The "Short Term Disability Claim Form – Update" that Defendant and/or EPIC received in July 2013 on behalf of Mr. Severson stated that surgery had not yet been performed on Mr. Severson.

55. The "Short Term Disability Claim Form – Update" that Defendant and/or EPIC received in July 2013 on behalf of Mr. Severson stated that Mr. Severson had been "diagnosed, received medical care, services, treatment, advice, or recommendations for this condition prior to the disability onset."

56. The "Short Term Disability Claim Form – Update" that Defendant and/or EPIC received in July 2013 on behalf of Mr. Severson stated that Mr. Severson's "current treatment plan" was "Epidural steroid injection."

57. The "Short Term Disability Claim Form – Update" that Defendant and/or EPIC received in July 2013 on behalf of Mr. Severson stated that Mr. Severson's "expected return to work date" was as follows: "Will be re-evaluated upon completion of MRU and epidural steroid

injection."

58. In July 2013, Defendant received an FMLA Health Care Certification form on behalf of Mr. Severson completed by Dr. Hollowell and dated July 12, 2013.

59. The FMLA Health Care Certification form that Defendant received in July 2013 on behalf of Mr. Severson completed by Dr. Hollowell and dated July 12, 2013 stated, among other things, that: (1) Mr. Severson's condition commenced on June 5, 2013; (2) medication was prescribed; (3) Mr. Severson was unable to perform his "job functions" due to the condition; (4) Mr. Severson was experiencing increased back pain with bilateral leg pain, a tingling/burning sensation in both of his legs up through his knee area, and lumbar lumbosacral disc degeneration; (5) the end date of Mr. Severson's incapacity was undetermined; and (6) Mr. Severson would be re-evaluated when his MRI and epidural steroid injection were scheduled and completed.

60. In July 2013, Defendant approved Mr. Severson's application for and use of continuous FMLA leave from approximately June 5, 2013 to August 28, 2013 for his back disability.

61. Between approximately June 10, 2013 and July 29, 2013, Mr. Severson called Defendant via telephone multiple times and left multiple messages.

62. Between approximately June 10, 2013 and July 29, 2013, Defendant did not return Mr. Severson's calls or messages left for Defendant.

63. On or about July 30, 2013, Schroeder spoke to Mr. Severson via telephone ("the July 30, 2013 phone conversation").

64. During the July 30, 2013 phone conversation, Mr. Severson updated Schroeder on the status of his back disability.

65. During the July 30, 2013 phone conversation, Mr. Severson told Schroeder that he was still experiencing significant back and leg pain despite the medication, treatments, and steroid injections.

66. During the July 30, 2013 phone conversation, Mr. Severson told Schroeder that his doctor wanted to try one more steroid injection to see if that would relieve the pain such that he could avoid surgery, but that if the steroid injection did not provide any pain relief, he would need at least one surgery on his back disability.

67. On or about August 13, 2013, Schroeder spoke to Mr. Severson via telephone ("the August 13, 2013 phone conversation").

68. During the August 13, 2013 phone conversation, Mr. Severson told Schroeder that he needed disc decompression surgery (a laminectomy) and that the surgery was scheduled for August 27, 2013.

69. During the August 13, 2013 phone conversation, Schroeder asked Mr. Severson when he would be able to return to work at Defendant without any work restrictions.

70. During the August 13, 2013 phone conversation, Mr. Severson told Schroeder that, subsequent to his surgery on August 27, 2013, it would take about two to four months for him to make a full recovery.

71. During the August 13, 2013 phone conversation, Mr. Severson told Schroeder that, subsequent to his surgery on August 27, 2013, it would be about two to four months before he could return to work at Defendant without lifting restrictions.

72. During the August 13, 2013 phone conversation, Mr. Severson told Schroeder that, immediately subsequent to his surgery on August 27, 2013, he would be able to return to work at Defendant with work restrictions.

73. During the August 13, 2013 phone conversation, Mr. Severson told Schroeder that, immediately subsequent to his surgery on August 27, 2013, he would be able to return to work at Defendant in a "light duty" position, one that did not require heavy lifting (or any lifting at all).

74. During the August 13, 2013 phone conversation, Mr. Severson asked Schroeder for an extended period of leave of two months subsequent to the expiration of his FMLA leave on or about August 28, 2013.

75. During the August 13, 2013 phone conversation and in response to Mr. Severson requesting an extended two-month leave subsequent to the expiration of his FMLA leave on or about August 28, 2013, Schroeder told Mr. Severson that she would "look into it" and call him back.

76. On or about August 20, 2013, Mr. Severson called Defendant to speak to Schroeder, but Schroeder did not answer the call and Mr. Severson did not leave a voicemail.

77. On or about August 23, 2013, Mr. Severson called Defendant and left a voicemail for Schroeder.

78. On or about August 26, 2013, Schroeder spoke to Mr. Severson via telephone ("the August 26, 2013 phone conversation").

79. During the August 26, 2013 phone conversation, Schroeder had Mr. Severson on speaker phone and Lawrence joined the call.

80. During the August 26, 2013 phone conversation, Schroeder told Mr. Severson that Defendant was terminating his employment effective August 28, 2013.

81. During the August 26, 2013 phone conversation, Schroeder told Mr. Severson that Defendant was terminating his employment effective August 28, 2013 because his FMLA leave

expired on August 28, 2013.

82. During the August 26, 2013 phone conversation, Schroeder told Mr. Severson that he could re-apply for a position with Defendant when he was released to return to work without work restrictions.

83. Defendant sent Mr. Severson a letter, dated August 27, 2013 and signed by Schroeder, stating in part: "We would like to thank you for your many years of dedicated service. Effective August 28, 2013, your 12 weeks of FMLA leave are up. Because of this, we are terminating your employment with Heartland Woodcraft, Inc. effective 8/28/13. When you are released by your doctor, you can re-apply with us."

84. Between June 5, 2013 and August 27, 2013, Defendant did not send or provide to Mr. Severson a Return to Work certification related to his return to work at Defendant from FMLA leave.

85. On or about August 27, 2013, Mr. Severson underwent a laminectomy.

86. From on or about June 5, 2013 through August 27, 2013, Mr. Severson received pain injections, prescription medication, and physical therapy as a result of and for his back disability.

87. Immediately subsequent to Mr. Severson's laminectomy surgery on or about August 27, 2013, Mr. Severson received physical therapy and was prescribed pain medication.

88. Immediately subsequent to Mr. Severson's laminectomy surgery on or about August 27, 2013, Mr. Severson was walking approximately five blocks every day per his physician's orders.

89. Approximately one month subsequent to Mr. Severson's laminectomy surgery on or about August 27, 2013, Mr. Severson was released from physical therapy.

90. Immediately subsequent to Mr. Severson's laminectomy surgery on or about August 27, 2013, Mr. Severson was able to return to work at Defendant with work restrictions.

91. Immediately subsequent to Mr. Severson's laminectomy surgery on or about August 27, 2013, Mr. Severson was able to return to work at Defendant in his position as Second Shift Lead with work restrictions.

92. Immediately subsequent to Mr. Severson's laminectomy surgery on or about August 27, 2013, Mr. Severson was able to return to work at Defendant and to perform the job duties or job responsibilities of his Second Shift Lead position with assistance from other employees of Defendant.

93. Immediately subsequent to Mr. Severson's laminectomy surgery on or about August 27, 2013, Mr. Severson was able to return to work at Defendant and to perform all of the job duties or job responsibilities of his Second Shift Lead position without assistance from other employees of Defendant except lifting fifty pounds or more, which required the assistance of other employees of Defendant.

94. Immediately subsequent to Mr. Severson's laminectomy surgery on or about August 27, 2013, Mr. Severson was able to return to work at Defendant into a vacant position that did not require heavy lifting (or any lifting at all).

95. Immediately subsequent to Mr. Severson's laminectomy surgery on or about August 27, 2013, Mr. Severson was able to return to work at Defendant into a vacant position, the job duties or job responsibilities of which included the following: supervising, inventory, bagging screws, product checks, counting product, ordering, scheduling, data entry, paperwork, and computer work.

96. Immediately subsequent to Mr. Severson's laminectomy surgery on or about August 27, 2013 and absent a vacant position for Mr. Severson to fill, Defendant nonetheless could have returned Mr. Severson to work at it to perform any of the following job duties or job responsibilities: supervising, inventory, bagging screws, product checks, counting product, ordering, scheduling, data entry, paperwork, and computer work.

97. Immediately subsequent to Mr. Severson's laminectomy surgery on or about August 27, 2013, Defendant did not return Mr. Severson to work at it.

98. Immediately subsequent to the expiration of Mr. Severson's FMLA leave on or about August 28, 2013, Mr. Severson was able to return to work at Defendant with work restrictions.

99. Immediately subsequent to the expiration of Mr. Severson's FMLA leave on or about August 28, 2013, Mr. Severson was able to return to work at Defendant in his position as Second Shift Lead with work restrictions.

100. Immediately subsequent to the expiration of Mr. Severson's FMLA leave on or about August 28, 2013, Mr. Severson was able to return to work at Defendant and to perform the job duties or job responsibilities of his Second Shift Lead position with assistance from other employees of Defendant.

101. Immediately subsequent to the expiration of Mr. Severson's FMLA leave on or about August 28, 2013, Mr. Severson was able to return to work at Defendant and to perform all of the job duties or job responsibilities of his Second Shift Lead position without assistance from other employees of Defendant except lifting fifty pounds or more, which required the assistance of other employees of Defendant.

102. Immediately subsequent to the expiration of Mr. Severson's FMLA leave on or about August 28, 2013, Mr. Severson was able to return to work at Defendant into a vacant position that did not require heavy lifting (or any lifting at all).

103. Immediately subsequent to the expiration of Mr. Severson's FMLA leave on or about August 28, 2013, Mr. Severson was able to return to work at Defendant into a vacant position, the job duties or job responsibilities of which included the following: supervising, inventory, bagging screws, product checks, counting product, ordering, scheduling, data entry, paperwork, and computer work.

104. Immediately subsequent to the expiration of Mr. Severson's FMLA leave on or about August 28, 2013 and absent a vacant position for Mr. Severson to fill, Defendant nonetheless could have returned Mr. Severson to work at it to perform any of the following job duties or job responsibilities: supervising, inventory, bagging screws, product checks, counting product, ordering, scheduling, data entry, paperwork, and computer work.

105. Immediately subsequent to the expiration of Mr. Severson's FMLA leave on or about August 28, 2013, Defendant did not return Mr. Severson to work at it.

106. On or about December 5, 2013, Mr. Severson was released to return to work without any work or lifting restrictions.

107. At the time of Mr. Severson's termination, Defendant compensated him at an hourly rate of $22.00 per hour, in addition to other employment benefits and/or insurance.

**Coverage and Procedural Posture**

108. Defendant is a covered employer for purposes of the FMLA.

109. During Mr. Severson's employment with Defendant, he did not meet the criteria under 29 C.F.R. § 825.217(a), which defines "key employee" as used in the FMLA.

110. Defendant employed at least 50 employees within 75 miles of Mr. Severson's work site.

111. At the time of Mr. Severson's FMLA leave requests, he had been employed at Defendant for 12 non-consecutive months and had worked at least 1250 hours during those 12 months.

112. Mr. Severson did not exceed the amount of FMLA leave for any FMLA leave entitlement period.

113. Subsequent to his termination from Defendant, Mr. Severson filed a complaint with the Wisconsin Department of Workforce Development – Equal Rights Division ("ERD"), which was designated ERD Case No. CR201303183 and cross-filed with the Equal Employment Opportunity Commission – Milwaukee Area Office ("EEOC") as EEOC Charge No. 26G201400190C, alleging claims of disability discrimination, perceived disability discrimination, and failure to accommodate.

114. The ERD issued a Probable Cause determination on ERD Case No. CR201303183 and EEOC Charge No. 26G201400190C dated April 30, 2014.

115. The EEOC issued Mr. Severson a Notice of Right to Sue on Charge No. 26G201400190C, dated July 10, 2014.

116. Mr. Severson has exhausted all administrative remedies and filing requirements prior to bringing this action.

## FIRST CAUSE OF ACTION – FMLA INTERFERENCE

117. Mr. Severson re-alleges and incorporates paragraphs 1-116 of this complaint by reference.

118. Defendant intentionally interfered with Mr. Severson's rights in violation of the Family and Medical Leave Act of 1993, as amended, 29 U.S.C. §§ 2601 *et seq*.

119. Defendant intentionally discriminated against Mr. Severson by terminating his employment in violation of the Family and Medical Leave Act of 1993, as amended, 29 U.S.C. §§ 2601 *et seq*.

120. As a result of Defendant's intentional violation of the FMLA, Mr. Severson has suffered damages in the form of loss of wages and other employment benefits and insurance.

## SECOND CAUSE OF ACTION – FMLA RETALIATION

121. Mr. Severson re-alleges and incorporates paragraphs 1-120 of this complaint by reference.

122. Defendant retaliated against Mr. Severson by terminating his employment for exercising his rights under the Family and Medical Leave Act of 1993, as amended, 29 U.S.C. §§ 2601 *et seq*.

123. As a result of Defendant's intentional violation of the FMLA, Mr. Severson has suffered damages in the form of loss of wages and other employment benefits and insurance.

## THIRD CAUSE OF ACTION – DISABILITY DISCRIMINATION

124. Mr. Severson re-alleges and incorporates paragraphs 1-123 of this complaint by reference.

125. Defendant intentionally discriminated against Mr. Severson on the basis of his disability or disabilities by denying him an extended medical leave of absence and/or time off of work at Defendant in reckless disregard for his federally protected rights under the Americans with Disabilities Act, as amended by the Americans with Disabilities Act Amendments Act of 2008, 42 U.S.C. §§ 12101, *et. seq*.

126. Defendant intentionally discriminated against Mr. Severson on the basis of his disability, disabilities, perceived disability, and/or perceived disabilities by terminating his employment based on his disability, disabilities, perceived disability, and/or perceived disabilities in reckless disregard for his federally protected rights under the Americans with Disabilities Act, as amended by the Americans with Disabilities Act Amendments Act of 2008, 42 U.S.C. §§ 12101, *et. seq*.

127. Defendant intentionally discriminated against Mr. Severson by failing to reasonably accommodate his disability and/or disabilities in reckless disregard for his federally protected rights under the Americans with Disabilities Act, as amended by the Americans with Disabilities Act Amendments Act of 2008, 42 U.S.C. §§ 12101, *et. seq*.

128. As a result of Defendant's intentional discrimination, Mr. Severson has suffered damages in the form of lost wages and benefits, emotional distress, pain and suffering, and attorneys' fees and costs.

**WHEREFORE**, Plaintiff respectfully requests that this Court:

1. Order Defendant to make Plaintiff whole by providing appropriate back pay, front pay and/or reinstatement, liquidated damages, compensatory damages, punitive damages, pre-judgment and post-judgment interest, and reimbursement for other benefits and expenses in an amount to be shown at trial;

2. Grant to Plaintiff attorneys' fees, costs, and disbursements as provided by statute; and

3. Grant to Plaintiff whatever other relief this Court deems just and equitable.

**PLAINTIFF DEMANDS A JURY AS TO ALL TRIABLE ISSUES.**

Dated this 17th day of September, 2014.

                                          WALCHESKE & LUZI, LLC
                                          Counsel for Plaintiff

                                          ***s/ Scott S. Luzi***
                                          James A. Walcheske, State Bar No. 1065635
                                          Scott S. Luzi, State Bar No. 1067405
                                          Jesse R. Dill, State Bar No. 1061704

WALCHESKE & LUZI, LLC
200 South Executive Drive, Suite 101
Brookfield, Wisconsin 53005
Phone: (262) 780-1953
Fax: (262) 565-6469
jwalcheske@walcheskeluzi.com
sluzi@walcheskeluzi.com
jdill@walcheskeluzi.com