# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**RAYMOND SEVERSON,**
    **Plaintiff,**

  **v.**           **Case No. 14-C-1141**

**HEARTLAND WOODCRAFT, INC.,**
    **Defendant.**

---

## DECISION AND ORDER

Plaintiff Raymond Severson filed a complaint alleging claims under the Americans with Disabilities Act ("ADA") and the Family and Medical Leave Act ("FMLA"). Before me now are several motions: (1) the defendant's motion for summary judgment on plaintiff's ADA claims; (2) the defendant's separate motion for summary judgment on plaintiff's FMLA claims; (3) the defendant's motion for sanctions under Federal Rule of Civil Procedure 11 against plaintiff's counsel, and (4) the plaintiff's motion to amend his complaint to withdraw the FMLA claims and amend certain other allegations in the complaint.

## I. BACKGROUND

Severson has been suffering from back issues since 2005. In 2006, he began working for the defendant, Heartland Woodcraft, Inc. Heartland manufactures shelves, tables, cabinets, and other fixtures used by retail stores to display merchandise, such as apparel. Severson was initially hired as a supervisor and was later promoted to "shop superintendent." In 2010, Severson was promoted to "operations manager," which was a position that involved more supervisory and administrative responsibilities than his prior positions.

By the middle of 2013, Severson's supervisors had decided that he was not meeting expectations as an operations manager. At a meeting on June 5, 2013, Patrick Koness, the president of Heartland, and Douglas Lawrence, the general manager of Heartland, informed Severson and that they were relieving him of the operations-manager position. However, at that same time, Heartland was in the process of expanding its second-shift operations to accommodate a significant increase in orders, and it wanted to find a new "second shift lead." In Heartland's view, the person who currently held that position, Curtis Strnad, was not performing well enough to handle the expanded operation. Heartland thought that Severson would be a good fit for the second-shift lead, and it offered him the job at the June 5th meeting. That job represented a demotion from the operations-manager position.

Also at the June 5th meeting, Severson informed Koness and Lawrence that he was experiencing severe back pain. The pain was not caused by a workplace injury. At Koness's suggestion, Severson went home for the day.

A few days later, on June 9th, Severson informed Heartland that he would accept the job as second-shift lead. However, Severson was still at home with back pain at that time, and thus he did not report to work to begin performing the job. On June 10th, Severson began submitting notes from his doctor indicating that he would be unable to report for work due his back pain. Over the course of the next month or two, it became apparent that Severson had a serious back problem. In early July, Severson notified Heartland that he was exercising his right to take a leave of absence under the FMLA. Severson asked Heartland to record that his FMLA leave began on June 5, 2013, and

2

Heartland did so. Severson remained on leave for the full twelve-week period allowed under the FMLA.

In mid-August, Severson notified Heartland that he was scheduled to have back surgery on August 27, 2013, the same day on which his FMLA leave would expire. He asked that Heartland provide him with an additional two months of medical leave following his surgery. Severson also informed Heartland that there was some chance he would need a second surgery, and that if he did need it, he would have to take an additional month's leave.

Severson made his request for additional leave to Jennifer Schroeder, Heartland's human-resources manager. After discussing Severson's request with a human-resources consultant, Schroeder presented it to Koness. Koness, in turn, decided that Heartland could not extend Severson's leave of absence by an additional two or three months. According to Koness, he made this decision because Heartland could not afford to have Strnad, who was performing poorly, remain in the second-shift lead position during Severson's extended leave, and that therefore Heartland could not hold that position open for Severson. Rather, Heartland needed to find someone to replace Strnad as soon as possible. Koness states that he gave some thought to hiring a temporary replacement for Strnad pending Severson's return but ultimately decided not to do so because it would have been hard to find a qualified candidate to fill the job temporarily, and because he did not want to train a temporary employee. Koness decided that Severson's employment would be terminated at the end of his FMLA leave, but that he would be invited to reapply for a job at Heartland once his doctors released him to return to work.

3

On August 26, 2013, Schroeder and Lawrence called Severson and informed him that he was being terminated as of August 28, 2013. Schroeder followed up with a letter containing the same information and inviting Severson to reapply at Heartland after his doctor released him to return to work. Severson did not accept that invitation. He commenced this action, alleging that Heartland failed to reasonably accommodate his back issues and therefore terminated him in violation of the ADA. Heartland has moved for summary judgment on this claim.

In his original complaint, Severson also alleged that Heartland intentionally interfered with his rights under the FMLA and terminated him in retaliation for exercising his FMLA rights. About halfway through discovery in this case, Heartland's counsel drafted a motion for Rule 11 sanctions and served it on Severson's counsel. In compliance with the safe-harbor provision of Rule 11(c)(2), Heartland's counsel did not at that time file the motion with the court. In the motion, Heartland's counsel argued that Severson's FMLA claims lacked reasonable evidentiary and legal support and therefore were filed in violation of Rule 11(b). Heartland also argued that several of the complaint's factual allegations lacked evidentiary support: its allegation that Severson could have returned to work "immediately" after his surgery in some capacity, and its allegation that Severson had told Heartland prior to the surgery that he could return to work immediately after the surgery in some capacity.

Within 21 days of service of the Rule 11 motion, plaintiff's counsel sent a letter to defendant's counsel in which she stated that the plaintiff would agree to amend his complaint, in part. The plaintiff agreed to withdraw his allegations that he could have returned to work immediately after the surgery and that he had told Heartland he could

4

have returned to work immediately after the surgery. The plaintiff also agreed to withdraw his claim for FMLA interference. As to the claim for FMLA retaliation, counsel stated that the plaintiff would reassess the claim following the completion of discovery. Plaintiff's counsel proposed to file, at the close of discovery, an amended complaint making the changes stated in the letter.

Defendant's counsel did not respond to plaintiff's counsel's letter, and the parties continued with discovery. A few weeks before the close of discovery, and about two months before the deadline for filing dispositive motions, the defendant filed a motion for summary judgment on the plaintiff's FMLA claims and also the motion for Rule 11 sanctions that it had previously served on plaintiff's counsel. Plaintiff's counsel then sent defendant's counsel an email reminding him that the plaintiff had agreed to withdraw most of the claims and allegations addressed in those motions. In addition, plaintiff's counsel stated that the plaintiff was now prepared to withdraw the FMLA retaliation claim. She attached a proposed stipulation of dismissal in which both of the FMLA claims would be dismissed with prejudice. Defendant's counsel refused to stipulate to the dismissal of the FMLA claims unless plaintiff agreed that the dismissal would not prevent the defendant from pursuing its motion for sanctions. The plaintiff would not so agree, and thus the parties did not execute the stipulation. Instead, the plaintiff filed a motion for leave to amend his complaint to withdraw the FMLA claims. The defendant opposes the motion to amend.

## II. DISCUSSION

I will first address the defendant's motion for summary judgment on the ADA claim. I will then address the defendant's motion for summary judgment on the FMLA claim, its motion for sanctions, and the plaintiff's motion to amend his complaint.

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, I take the evidence in the light most favorable to the non-moving party and may grant the motion only if no reasonable juror could find for that party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 255 (1986).

### A. ADA Claim

The ADA provides that a covered employer shall not "discriminate against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). "Discrimination," for the purposes of § 12112(a), includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability" unless the employer "can demonstrate that the accommodation would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A). To establish a claim for failure to accommodate, a plaintiff must show that he is a "qualified individual with a disability." EEOC v. Sears, Robuck & Co., 417 F.3d 789, 797 (7th Cir.2005). A qualified individual is defined as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position." 42 U.S.C. § 12111(8). The

6

plaintiff has the burden of proving that he was a "qualified individual" at the time of his termination. Stern v. St. Anthony's Health Ctr., 788 F.3d 276, 285 (7th Cir. 2015).

Heartland does not dispute that Severson was disabled within the meaning of the ADA, or that he satisfied the basic prerequisites for the second-shift lead position, "such as possessing the appropriate educational background, employment experience, skills, licenses, etc." Id. However, Heartland contends that no reasonable jury could find that Severson could have performed the essential functions of the second-shift lead position (or any other vacant position at Heartland) at the time of his termination, with or without reasonable accommodation. In this regard, Heartland contends that an essential function of the second-shift lead position was the ability to lift heavy items, which was something that Severson would not have been able to do for approximately two months after his surgery.

Severson concedes that, as things looked prior to his surgery, he would not have been able to do much of the lifting associated with the second-shift lead position for some time after his back surgery. He also concedes that the second-shift lead is generally required to lift heavy items. Severson Dep. at 84:19–22, ECF No. 54-1. However, Severson contends that lifting was only a marginal function of the position, not an essential function, and that Heartland could, as a reasonable accommodation, have reallocated his lifting duties to other employees until his lifting restrictions were lifted. See Stern, 788 F.3d at 290–91 (explaining that reallocating marginal functions can be a reasonable accommodation but that reallocating essential functions is not). Severson contends that with this reasonable accommodation he could have performed all of the essential functions

7

of the second-shift lead position "shortly after [his] back surgery." Severson Decl. ¶ 29, ECF No. 52.

Under the ADA, the factors a court should consider to determine whether a particular duty is an essential function include the employee's job description, the employer's opinion, the amount of time spent performing the function, the consequences for not requiring the individual to perform the duty, and past and current work experiences." Stern, 788 F.3d at 285 (quoting Gratzl v. Office of the Chief Judges, 601 F.3d 674, 679 (7th Cir.2010)); see 29 C.F.R. § 1630.2(n)(3). The employer's judgment is an important factor, but it is not controlling; the court also looks to evidence of the employer's actual practices in the workplace. Id. (quoting Miller v. Ill. Dep't of Transp., 643 F.3d 190, 198 (7th Cir.2011)).

According to Heartland's written job description, the second-shift lead "performs manual labor in the production area," "operates and troubleshoots machinery," "perform[s] minor repairs as necessary," and "maintains the building." ECF No. 46-2. The job description also states that the position involves various administrative and supervisory duties, such as "convey[ing] all production priorities to second shift personnel," "assur[ing] that productivity expectations are met on 2nd shift," and "complet[ing] daily production logs." Id. Under a section entitled "working conditions," the job description states:

> Working conditions are normal for a manufacturing environment. Work may involve frequent lifting of materials and product of 50 pounds, or occasionally more. Occasional physical exertion is required. Assisting in the loading of trucks, moving materials, or generally helping others will be required from time to time.

Id.

8

Koness and Lawrence describe the second-shift lead as being a "working lead" position, by which they mean that the person holding the job has "general responsibility for ensuring that production and quality expectations are met on the 2nd shift" but also must assist subordinates with manufacturing tasks. See Koness Aff. ¶ 17, ECF No. 25; Lawrence Aff. ¶ 7, ECF No. 46. Koness and Lawrence identify several lifting tasks for which the second-shift lead is responsible. One of the duties of this position is to "stage" the production projects that will be performed during the shift. Koness Aff. ¶ 18. This involves identifying the work that will be performed during the shift and the raw materials and other inputs that will be needed for the production associates to perform their tasks, and then retrieving those materials and inputs from other parts of the facility and transporting them to the production area. In the course of staging, the second-shift lead will have to pull raw materials, including sheets of particle board weighing up to 170 pounds and stacks of pre-cut panels, to the production area. In addition to staging, the second-shift lead works directly with assemblers and machine operators to set up and operate equipment, and to fabricate and assemble materials into finished products. This work regularly involves lifting equipment, raw materials, fixture components, and finished fixtures weighing from 30 pounds to over 50 pounds, and assisting in lifting fixture components and completed fixtures weighing from 100 to over 300 pounds. Koness Aff. ¶ 19; see also Lawrence Aff. ¶¶ 8–12. Koness states that "[a] Lead subject to a 20 pound lifting restriction would constantly have to pull associates from their own jobs in distant parts of

9

the plant to assist with the routine lifting that is an integral part of the 2nd Shift Lead's duties, and this would severely disrupt production." Koness Aff. ¶ 20.[1]

If the written job description, Koness's and Lawrence's descriptions of the second-shift lead position, and Koness's description of the consequences of employing a lead who was unable to lift more than 20 pounds are accurate, then lifting would be an essential function of the lead position. Cf. Majors v. Gen. Elec. Co., 714 F.3d 527, 543 (7th Cir. 2013); Peters v. City of Mauston, 311 F.3d 835, 845 (7th Cir. 2002); Basith v. Cook County, 241 F.3d 919, 928–29 (7th Cir. 2001).

Severson does not dispute that the second-shift lead is expected to perform the tasks described in the job description, and he does not point to any evidence in the record that contradicts Koness's and Lawrence's descriptions of the second-shift lead's duties. Severson does point to information that Heartland submitted to an insurance company in connection with Severson's application for long-term disability benefits in August 2013. In

---

[1]In addition to the evidence described in the text, Heartland submits affidavits from two individuals, Samuel Barbercheck and Donald Enders, who held the second-shift lead position in 2015. These individuals largely concur with Koness's and Lawrence's descriptions of the job, and they add that they each spent about 90% of their time engaged in physical work involving repeated bending, twisting, and lifting, including the lifting of items weighing between 30 and 100 pounds. See generally ECF Nos. 47 & 48. The plaintiff argues that Heartland cannot use these affidavits to support its motion for summary judgment because it failed to disclose Barbercheck and Enders under Federal Rule of Civil Procedure 26(a) and (e) until after the close of discovery, which prevented the plaintiff from deposing them. See Fed. R. Civ. P. 37(c)(1). I agree that the defendant's failure to timely disclose Barbercheck and Enders means that the defendant cannot use information supplied by them in support of its motion for summary judgment. However, because nearly all of the information contained in the affidavits of Barbercheck and Enders is also in the affidavits of Koness and Lawrence, and because the plaintiff does not argue that Koness and Lawrence lack personal knowledge of the aspects of the second-shift lead position they describe in their affidavits, the exclusion of Barbercheck's and Enders's affidavits is inconsequential.

10

that application, Heartland stated that lifting building products and transporting materials weighing "50+" pounds were "occasional" functions of the second-shift lead position. ECF No. 54-3 at p. 22 of 37. The form defined "occasionally" as meaning "the person does the activity up to 33% of the time." Id. Severson contends that this information is inconsistent with Heartland's claim that the second-shift lead performed "physical activity" on a regular basis. However, if a person performs a function as much as 33% of the time while on the job, one could fairly say that the person performs the function regularly. Moreover, on the disability form, Heartland identified a number of other physical activities that the second-shift lead performed up to 33% of the time, including pushing, pulling, carrying, climbing, stooping, crouching, and working overhead. When all of these separate tasks are added together, one could easily conclude that the second-shift lead performed physical work more than 33% of the time. Also, the form does not identify how often the second-shift lead lifted less than 50 pounds. Presumably, lifting less than 50 pounds would be a more frequent task. Thus, the insurance form is consistent with Heartland's claim that lifting was an essential function of the second-shift lead position.

Severson does not point to any "evidence of the employer's actual practices in the workplace," Stern, 788 F.3d at 285, that suggests lifting is not an essential function of the second-shift lead position. Although Severson was offered that position on June 5, 2013, he never actually performed the job, and there is no evidence in the record that Severson worked on second shift prior to his leave of absence and observed the work performed by the second-shift lead during that time. Thus, Severson has not shown that he has personal knowledge of the amount of lifting the position required in practice or the consequences

11

of requiring other employees to perform the lifting normally done by the second-shift lead.[2]

See Fed. R. Civ. P. 56(c)(4). Nor has Severson submitted declarations or deposition testimony from others who worked on second shift that contradicts Koness's and Lawrence's descriptions of the amount of lifting the lead performed or Koness's statement that reallocating the lead's lifting duties would disrupt production.[3]

In his declaration, Severson contends that his duties as shop superintendent were similar to those of the second-shift lead, and that he was able to perform the essential functions of the superintendent position with a fifteen-pound lifting restriction between November 2010 and January 2011. Severson Decl. ¶¶ 33–36. However, as just discussed, Severson has not shown that he has personal knowledge of the duties of the second-shift lead, and thus his assertion that the duties of the lead were similar to those he performed as shop superintendent is inadmissible on summary judgment. Fed. R. Civ. P. 56(c)(4). Koness and Lawrence have submitted their own affidavits in which they explain that the duties of the two positions are not similar and that the second-shift lead performs much more physical activity than the shop superintendent. Supp. Koness Aff.

_____

[2]Of course, because Severson was offered and accepted the job as second-shift lead, he likely had a general idea of what the position entailed. But the important point is that, so far as the record reveals, Severson has not observed the "actual practices" performed by the second-shift lead in the workplace. Stern, 788 F.3d at 285.

[3]Severson notes that Heartland does not submit declarations or other evidence from persons either holding or directly supervising the second-shift lead in 2013 as evidence of the amount of lifting performed by the lead at that time. See Pl.'s Br. at 7 n. 11, ECF No. 49. But if Severson thinks that those persons would contradict Koness's or Lawrence's descriptions of the job, then it would be his burden to submit such evidence in opposition to Heartland's motion for summary judgment. The plaintiff does not contend that Lawrence or Koness lack personal knowledge of the essential functions performed by the second-shift lead in 2013, and their affidavits lay a foundation showing that, in fact, they have such personal knowledge. See Koness Aff. ¶ 16, Lawrence Aff. ¶ 6.

12

¶¶ 8–15, ECF No. 59; Supp. Lawrence Aff. ¶¶ 4–11, ECF No. 62. And in their affidavits, Koness and Lawrence explain that they have personal knowledge of the day-to-day activities performed by both the second-shift lead and the shop superintendent. Supp. Koness Aff. ¶ 3; Supp. Lawrence Aff. ¶¶ 3–4.[4] Thus, Severson's assertion that the second-shift lead position required no more lifting than the shop superintendent position does not create a genuine factual dispute over whether lifting was an essential function of the lead position.

Severson also offers an affidavit from a former operations manager, Roy Desimone, who worked with Severson while he was the shop superintendent. ECF No. 56-11. Desimone states that, during that time, Severson "worked as an administrator, rather than a 'worker bee.'" ¶ 6. Again, however, the position of second-shift lead is different than shop superintendent, and as discussed above, the admissible evidence establishes that the lead position involved more manual labor than the shop superintendent position. Thus, Desimone's observations concerning the amount of physical activity Severson performed while he was a shop superintendent do not create a genuine factual dispute.

Accordingly, Heartland is entitled to summary judgment on the issue of whether lifting was an essential function of the second-shift lead position. Because lifting was an

---

[4]Some of Lawrence's statements in his supplemental affidavit appear to be based on hearsay—i.e., based on reports he received from other employees rather than his own observations, see Supp. Lawrence Aff. ¶¶ 3 & 6, and thus those statements may be inadmissible for lack of personal knowledge. But see Fed. R. Evid. 803(6) (hearsay exception for records of regularly conducted activity). However, Koness's affidavit is based on his own observations, see Supp. Koness Aff. ¶ 9 ("it has been my expectation and observation . . .), and thus it is admissible. Even if Lawrence's supplemental affidavit were excluded, Koness's supplemental affidavit would be sufficient to support the conclusion that the second-shift lead performed more lifting than the shop superintendent.

essential function, requiring Heartland to reallocate Severson's lifting duties to other employees would not have been a reasonable accommodation.  See Majors, 714 F.3d at 535–35 (having another person perform an essential function of the job is, as a matter of law, not a reasonable accommodation); Peters, 311 F.3d at 845–46 (reallocating lifting duties to other employees is not a reasonable accommodation when lifting is an essential function of the job); Basith, 241 F.3d at 929–30 (ADA does not require employer to reallocate the essential functions of the job).

Severson next contends that he was a qualified individual because he could have eventually performed the essential functions of the second-shift lead position, including lifting, if Heartland would have allowed him to continue his leave of absence for an additional two or three months after surgery.  However, the case law in the Seventh Circuit provides that a person is not a "qualified individual" if his disability prevents him from performing the essential functions of his job for months at a time.  Byrne v. Avon Prods., Inc., 328 F.3d 379, 380–81 (7th Cir. 2003) ("Inability to work for a multi-month period removes a person from the class protected by the ADA."); see also Basden v. Prof'l Transp., Inc., 714 F.3d 1034, 1037 (7th Cir. 2013) ("A plaintiff whose disability prevents her from coming to work regularly cannot perform the essential functions of her job, and thus cannot be a qualified individual for ADA purposes.").  To be sure, the cases recognize that if a disability involves an "intermittent condition" that requires occasional time off for "brief periods," such as a few days or a couple of weeks, then a person may be a qualified individual, and granting the person brief periods of leave may be a reasonable accommodation.  Byrne, 328 F.3d at 380–81; Haschmann v. Time Warner Entm't Co., 151 F.3d 591, 599–601 (7th Cir. 1998). But at the time Heartland terminated Severson's

14

employment, he had been unable to perform any of the essential functions of the second-shift lead position for three months, and he would remain unable to perform some of the essential functions of the position for an additional two or three months. Thus, at the time of his termination, which is the time that matters, see Basden, 714 F.3d at 1037 (whether person is a qualified individual is examined as of the time of the adverse employment decision at issue), Severson was not a qualified individual, and the ADA did not require Heartland to grant him an additional two or three months off as a reasonable accommodation.[5]

Severson next contends that the ADA required Heartland to provide him with temporary, light-duty work—such as supervising and training employees, bagging screws, and assembling lighter-weight fixtures—until he was able to perform the essential functions of the second-shift lead position. Heartland does not maintain any full- or part-time light-duty positions at its facility, and the plaintiff concedes that Heartland would have had to create a light-duty position for him by temporarily reallocating various functions normally performed by other employees. Pl.'s Br. at 24, ECF No. 49. But the plaintiff contends that Heartland has in the past created such temporary light-duty positions for other employees, especially those who were recovering from workplace injuries, and he argues that the ADA required Heartland to treat him just as favorably as it treated those other employees.

Severson's argument that the ADA requires an employer to provide a disabled employee with any accommodation it has provided to other employees in the past is off the

---

[5]Because I conclude that an additional two- or three-month leave of absence would not have been a reasonable accommodation, I do not consider Heartland's argument that granting Severson such leave would have caused it to suffer an undue hardship.

15

mark.  An employer may provide an employee with an accommodation not required by the ADA without thereby becoming obligated to provide all similarly situated employees with the same accommodation.  See Basith, 241 F.3d at 930 (stating that employer should not be "punish[ed] . . . for going beyond the ADA's requirements"); Sieberns v. Wal-Mart Stores, Inc., 125 F.3d 1019, 1023 (7th Cir. 1997) ("[e]mployers should not be discouraged from doing more than the ADA requires"); Vande Zande v. State of Wisconsin, 44 F.3d 538, 545 (7th Cir. 1995) ("if the employer . . . bends over backwards to accommodate a disabled worker—goes further than the law requires—it must not be punished for its generosity by being deemed to have conceded the reasonableness of so far-reaching an accommodation.  That would hurt rather than help disabled workers.").  Moreover, the ADA does not require an employer to create "new" positions for disabled employees.  Stern, 788 F.3d at 291; Sieberns, 125 F.3d at 1023; Gile v. United Airlines, Inc., 95 F.3d 492, 499 (7th Cir. 1996).  Thus, assuming that the plaintiff is correct and that Heartland has created temporary light-duty positions for some employees, the ADA did not require Heartland to create such a position for Severson.

Severson cites my decision in Gibson v. Milwaukee County, 95 F. Supp. 3d 1061 (E.D. Wis. 2015), in support of his argument that because Heartland has created light-duty positions for other employees, the ADA required it to also create one for him.  In Gibson, I found that an employer failed to reasonably accommodate the plaintiff's disability when it refused to temporarily transfer her to a vacant light-duty position that the employer reserved for workers recovering from workplace injuries.  Id. at 1071–73.  I concluded that the employer's wanting to reserve its light-duty program for those recovering from workplace injuries was not a sufficient reason for refusing to allow the plaintiff to occupy

16

a vacant position.  Id.  But the key to this holding was that the light-duty position at issue existed and was vacant at the time when the employee needed the accommodation.  The holding was based on the principle that the ADA requires an employer to consider, as a reasonable accommodation for a disabled employee, transferring or reassigning that employee to a vacant position for which he or she is qualified.  See, e.g., Dalton v. Subaru-Isuzu Auto., Inc., 141 F.3d 667, 677–79 (7th Cir. 1998).  Thus, if the employer has a vacant light-duty position available, and the disabled employee is qualified for that position, the employer must consider transferring the employee to the position, even if the position is normally reserved for employees recovering from workplace injuries.  Gibson, 95 F. Supp. 3d at 1071–72.

Unlike the employer in Gibson, Heartland does not maintain dedicated light-duty positions.  Rather, according to the plaintiff, Heartland creates such positions as needed as part of its "return to work" program, which is designed to ensure that Heartland complies with its obligations under the state's worker's compensation law and minimizes its worker's compensation insurance costs.  Pl.'s Br. at 19–24, ECF No. 49.  As already discussed, the ADA does not require an employer to create a new position for a disabled employee as a reasonable accommodation.  Thus, Heartland may voluntarily create light-duty positions for employees recovering from workplace injuries without becoming compelled to create such positions for employees who are protected by the ADA.  Indeed, the same EEOC Guidance that I cited in Gibson makes that very point: "An employer need not create a light duty position for a non-occupationally injured employee with a disability as a reasonable accommodation. The principle that the ADA does not require employers to create positions as a form of reasonable accommodation applies equally to the creation of light duty

17

positions." EEOC Enforcement Guidance: Workers' Compensation and the ADA, 1996 WL 33161342, at *12 (September 1996).  The EEOC provides the following example of this principle:

> R creates light duty positions for employees when they are occupationally injured if they are unable to perform one or more of their regular job duties. CP can no longer perform functions of her position because of a disability caused by an off-the-job accident. She requests that R create a light duty position for her as a reasonable accommodation. R denies CP's request because she has not been injured on the job. R has not violated the ADA.

Id. at *13.[6]  In short, although the ADA requires employers to consider transferring disabled employees to vacant light-duty positions, it does not require employers to consider creating light-duty positions for disabled employees, even if the employer creates light-duty positions for employees who are injured on the job.

Severson next contends that even if Heartland did not have an obligation to create a light-duty position for him, it could have transferred him to another vacant position for which he was qualified and for which lifting was not an essential function.  He notes that between the date of his surgery and the date on which his work restrictions were lifted, Heartland had a number of vacancies for production-level positions, such as assemblers and machine operators.  All of these positions would have represented demotions from the

---

[6]The EEOC Guidance also states that an employer, to offset worker's compensation costs, may make modifications to job duties for occupationally injured employees that would not be reasonable accommodations under the ADA without also making those same accommodations for non-occupationally injured employees.  See 1996 WL 33161342, at *12 ("Nothing in the ADA prohibits an employer from making a workplace modification that is not a required form of reasonable accommodation under the ADA for an employee with an occupational injury in order to offset workers' compensation costs. For example, the ADA does not require employers to lower production standards to accommodate individuals with disabilities. However, an employer is clearly permitted to lower production standards for an occupationally injured employee as a way of returning him/her to work more quickly.").

18

second-shift lead position, and would have been three steps below the position of operations manager, which Severson held prior to his demotion to second-shift lead. However, the employer's duty to accommodate under the ADA requires it to consider transferring the employee to jobs that would represent a demotion. Dalton, 141 F.3d at 678. Thus, if Severson was qualified for the vacant production-level positions, Heartland would have been required to consider transferring him to one of those positions as a reasonable accommodation.

Heartland concedes that Severson possessed the basic background qualifications for the vacant production-level positions. But it contends that, as with the second-shift lead, lifting was an essential function of those positions, and thus transferring Severson to one of them would not have been a reasonable accommodation. The written description for each of the vacant jobs supports this contention. See Supp. Koness Aff. Exs. H–L (stating that positions require ability to lift between 30 and 75 pounds, and occasionally more). In his affidavit, Koness explains that, in actual practice, the employees who hold these positions frequently lift heavy items and that it would be impractical to reallocate the lifting associated with the positions to other employees. Id. ¶ 18.

Although Severson concedes that lifting was generally a function of each of the vacant production positions, he argues that lifting was not an essential function because another employee, Wade Plautz, was able to work as an assembler even though he had a lifting restriction. In 2015, as a result of a non-workplace injury, Plautz was restricted to lifting no more than 30 pounds. Pl. Prop. Finding of Fact ¶ 85, ECF No. 50. Heartland was able to accommodate this restriction by assigning him sub-assembly jobs that were smaller and did not require him to lift more than 30 pounds. Id.

19

The most Heartland's accommodation of Plautz's lifting restriction shows is that lifting more than 30 pounds was not an essential function of the assembly position that Plautz held; it does not show that lifting in general was not an essential function of the various production positions that were vacant during the period following Severson's surgery. Indeed, Plautz was still required to lift the items he was working on and did not rely on other employees to do his lifting for him, as Severson would have had to do during the months following his surgery. See Supp. Koness Aff. ¶ 20. Rather, Heartland was able to identify the lightest tasks it had available and allocate them to Plautz. This would not have been a possible accommodation for Severson, as even the lightest tasks required the ability to lift in excess of Severson's restrictions. Id. Thus, Heartland's accommodation of Plautz's restriction does not support the conclusion that lifting was not an essential function of the vacant production-level positions.

Severson also points out that Heartland accommodated another production-level employee, Ed Kurzynski, with a lifting restriction. In February 2013, Kurzynski's hand was crushed in a work-related accident. See Temeyer Decl. Ex. K, ECF No. 55-4; Supp. Koness Aff. ¶ 25. He was completely absent from work for a prolonged period and was receiving treatment from a psychologist for stress caused by the accident. During his recovery period, Kurzynski's psychologist directed Kurzynski to report to Heartland for a few hours at a time to observe the production area. The purpose of this was to determine whether Kurzynski could tolerate being in the environment where he suffered his injury. During this period, Heartland assigned Kurzynski some work that he could perform within the restrictions associated with his hand injury. However, such work was not regularly available, and Kurzynski spent most of his time simply observing the production area.

20

Eventually, the psychologist determined that Kurzynski would be unable to return to work at Heartland in any capacity. Heartland then terminated Kurzynski's employment. See Supp. Koness Aff. ¶¶ 25–28.

The evidence pertaining to Kurzynski does not support the conclusion that lifting was not an essential function of the vacant production-level positions. The work Kurzynski performed after his accident was not the work of a typical production-level employee. Rather, Heartland essentially created a special position for him to facilitate his recovery from a workplace injury. And as discussed above, Heartland could create a special position for an employee recovering from a workplace injury—could provide that employee with an accommodation not required by the ADA—without thereby becoming obligated by the ADA to provide all similarly situated employees with the same accommodation. See Basith, 241 F.3d at 930; Sieberns, 125 F.3d at 1023; Vande Zande, 44 F.3d at 545; EEOC Enforcement Guidance, 1996 WL 33161342, at *12–13. Thus, the evidence pertaining to Kurzynski does not create a genuine issue of fact.

Finally, Severson argues that Heartland failed to engage in the interactive accommodation-exploration process required by the ADA. When an employee asks for an accommodation because of a disability, the employer must engage with the employee in an interactive process to determine the appropriate accommodation under the circumstances. See, e.g., Kauffman v. Peterson Health Care, 769 F.3d 958, 963 (7th Cir. 2014). Here, Severson asked Heartland for an accommodation because of a disability when he asked Heartland to extend his leave of absence for an additional two or three months. Heartland likely breached its duty to engage in the interactive process when it denied his request for leave and terminated him without further discussion as to whether

21

some other accommodation would be reasonable.  See Basden, 714 F.3d at 1038–39

(finding that employer breached duty to engage in interactive process when, in response

to employee's request for leave, employer terminated the employee without engaging

employee in further discussion).  However, "the failure to engage in the interactive process

required by the ADA is not an independent basis for liability under the statute, and that

failure is actionable only if it prevents identification of an appropriate accommodation for

a qualified individual."  Id. at 1039.  "Even if an employer fails to engage in the required

process, that failure need not be considered if the employee fails to present evidence

sufficient to reach the jury on the question of whether she was able to perform the essential

functions of her job with an accommodation."  Id.  As discussed above, Severson has failed

to present evidence from which a jury could reasonably conclude that he could have

performed the essential functions of his job with a reasonable accommodation.  Thus,

Heartland's likely failure to engage in the interactive process is not an independent basis

for liability.  Heartland's motion for summary judgment on the ADA claim will be granted.

## B.    FMLA Motion for Summary Judgment, Motion to Amend, and Motion for Sanctions

As discussed in the background section, above, the plaintiff has sought leave to

amend his complaint to withdraw his FMLA claims, yet the defendant insists that leave

should not be granted and that instead summary judgment should be entered on those

claims.  The only reason to enter summary judgment rather than grant the plaintiff's

request for leave to withdraw the claims would be to make clear that the FMLA claims are

dismissed on the merits and therefore cannot be re-filed in a separate suit.  But I do not

understand the plaintiff to be asking to withdraw the FMLA claims without prejudice to their

22

being re-filed in a separate suit. To the contrary, the plaintiff asked the defendant to stipulate to a dismissal of the claims with prejudice. Moreover, because the FMLA claims arose out of the same transaction as the ADA claim, a final judgment on the ADA claim would preclude a future suit on the FMLA claims. See, e.g., Cannon v. Burge, 752 F.3d 1079, 1101 (7th Cir. 2014). Thus, it makes no practical difference whether the FMLA claims are dismissed by way of plaintiff's motion to amend or defendant's motion for summary judgment. I will grant the motion to amend and deny the motion for summary judgment.

That leaves the defendant's motion for Rule 11 sanctions. The purpose of Rule 11 is to deter baseless filings in the district court. Cooney v. Casady, 735 F.3d 514, 523 (7th Cir. 2013). The rule is not a fee-shifting measure—it provides only that a court may impose an "appropriate sanction" for a violation of Rule 11(b). Id.; Fed. R. Civ. P. 11(c)(1). When a district court determines that Rule 11(b) has been violated, it "may," but is not required to, impose a sanction. See Cunningham v. Waters Tan & Co., 65 F.3d 1351, 1360–61 (1995); 2 James Wm. Moore, Federal Practice and Procedure § 11.23[2] (3d ed. 2015). As is relevant here, Rule 11(b) provides that "[b]y presenting to the court a pleading . . . an attorney . . . certifies that to the best of the person's knowledge, information and belief, formed after an inquiry reasonable under the circumstances . . . (2) the claims . . . are warranted by existing law . . . [and] (3) the factual allegations have evidentiary support." Fed. R. Civ. P. 11(b)(2)–(3).

As discussed in the background section, the defendant contends that the plaintiff's FMLA claims were baseless and that the factual allegation that the plaintiff could have returned to work "immediately" after his surgery in some capacity, and the allegation that

23

he told this to Heartland, were also baseless. Starting with the factual allegations, I conclude that they were not baseless. The allegation that the plaintiff could have returned to work immediately in some capacity is supported by the plaintiff's own assessment of his abilities. At his deposition, he testified that as soon as the day after his surgery, he was able to walk and could engage in some physical activity. Severson Dep. at 77. He testified that he believed could have performed light-duty work and could have done some of the work associated with the second-shift lead position, just not the lifting, within a matter of days after the surgery. Id. at 79, 84. Although it is likely that the plaintiff could not have returned to work the day of his discharge from the hospital, the word "immediately" is a relative term, and it is unreasonable to interpret the allegations of the complaint as meaning that the plaintiff could have walked out of the hospital and straight to Heartland's facilities to perform light-duty work. A more reasonable interpretation of the complaint is that the plaintiff was alleging that he could have returned to work in a light-duty capacity within a few days after the surgery. Given the plaintiff's own description of how he felt after his surgery, that allegation was not baseless. Therefore, plaintiff's counsel did not violate Rule 11(b) by alleging that the plaintiff could have returned to work "immediately" after his surgery in some capacity.

Likewise, the allegation that Severson told Heartland that he would be able to return to work immediately after his surgery in a light-duty capacity is not baseless. The defendant takes issue with the complaint's allegation that Severson told Heartland's human-resources manager, Jennifer Schroeder, during a phone conversation on August 13, 2013, that he could return to work immediately after his August 27 surgery in a restricted or light-duty capacity. The defendant contends that Severson knew that such a

24

conversation did not take place, and that therefore counsel had no basis for including the allegation in the complaint. But the record indicates that Severson thought he had such a conversation with Schroeder sometime between June and mid-August, and that he had trouble remembering the exact date. Severson Decl. ¶ 16, ECF No. 52. Thus, counsel had a reasonable basis for alleging that Severson had such a conversation with Schroeder on August 13th, and counsel did not violate Rule 11(b) in making the allegation.

Turning to the FMLA claims, it is hard to find a reasonable basis for the FMLA interference claim. Severson received the full twelve weeks of leave to which he was entitled, and plaintiff's counsel has not explained why she (or her colleague who signed the complaint) included it in the complaint. However, I do not think that including such a claim in the complaint warrants sanctions. The claim itself consists of four conclusory paragraphs, see Compl. ¶¶ 117–20, and the defendant could not have spent any significant time or resources defending against it. See Advisory Committee Notes to 1993 Amendment to Rule 11 ("Rule 11 motions should not be made or threatened for minor, inconsequential violations of the standards prescribed by subdivision (b)."). Although the defendant filed a motion for summary judgment on the claim, it did so only after plaintiff's counsel stated in writing that the plaintiff had agreed to withdraw that very claim and that she would do so by filing an amended complaint at the close of discovery. It is true that by the time the defendant filed its motion for summary judgment, the plaintiff had not yet filed a formal pleading withdrawing the claim, but I do not see why that matters. Defendant's counsel did not respond to plaintiff's counsel's letter stating that she would withdraw the claim at the end of discovery, and thus plaintiff's counsel had no reason to think that defendant's counsel was not satisfied with the proposal to wait until then to

25

formally amend the complaint. Moreover, the deadline for dispositive motions would not run for more than a month after the close of discovery, so if for some reason plaintiff's counsel did not follow through on her promise to withdraw the claim at the end of discovery, the defendant could have filed its motion for summary judgment at that time. The defendant's decision to expend resources in moving for summary judgment on a claim that the plaintiff had already agreed to withdraw thus does not support sanctioning plaintiff's counsel for including the claim in the complaint.

Moreover, the defendant's brief in support of its motion for summary judgment on the FMLA claims does not contain any substantial argument on those claims—the brief does not cite Rule 56 or discuss the legal principles applicable to FMLA claims. Rather, the brief argues that plaintiff's counsel should be sanctioned for filing the claims and requests that the claims be dismissed. In light of this, I doubt that defendant's counsel expended substantial resources preparing its motion for summary judgment on the FMLA claims. Really all counsel did was prepare a brief in support of the motion for sanctions.

As for the FMLA retaliation claim, it was not baseless. Heartland terminated Severson as soon as he had exhausted his FMLA leave. Cases recognize that when an adverse employment action occurs on the heels of protected activity, an inference of causation may be sensible. See, e.g., Loudermilk v. Best Pallet Co., 636 F.3d 312, 315 (7th Cir. 2011). True, the timing of the termination would not, by itself, have been sufficient to survive summary judgment on an FMLA retaliation claim, and it may not even have been sufficient to survive a motion to dismiss for failure to state a claim on which relief can be granted. But it was enough to prevent the claim from being completely baseless.

In any event, even if plaintiff's counsel committed a technical violation of Rule 11(b) by including the FMLA retaliation claim in the complaint, it was a minor and inconsequential violation. The FMLA retaliation claim was made up of three conclusory allegations, <u>see</u> Compl. ¶¶ 121–23, and the defendant could not have spent a significant amount of time or resources defending against it. As discussed, even though the defendant filed a motion for summary judgment on the claim, its brief in support of that motion is devoid of any substantive argument on the FMLA claims and is instead a brief in support of the motion for sanctions. Moreover, before defendant's counsel filed the motion for summary judgment, plaintiff's counsel told him that the plaintiff would consider withdrawing the claim at the close of discovery. The deadline for filing dispositive motions would not run until more than a month after the close of discovery, and the defendant waited until that deadline to file its summary judgment motion on the plaintiff's ADA claim. It is not clear why the defendant did not simply wait until after the plaintiff decided whether it would withdraw the claim before filing its separate motion for summary judgment on that claim. Given this sequence of events, I can see no reason to sanction plaintiff's counsel.

Accordingly, the defendant's motion for Rule 11 sanctions will be denied.

## C. Motion to Seal

Before concluding, I must address an administrative matter. In connection with his opposition to the defendant's motion for summary judgment on the ADA claim, the plaintiff filed several documents under seal, along with a motion to seal. In the motion to seal, the plaintiff does not provide any grounds for removing the documents from the public record, other than to note that someone marked the documents "confidential" pursuant to the protective order entered in this case. But the protective order requires a party filing a

27

confidential document with the court to provide the court with a statement of reasons why the material is confidential. <u>See</u> ECF No. 41 at 8–9.

In any event, three of the documents, Exhibits K, L, and M to the Declaration of Kelly Temeyer, reveal medical information about nonparties. For this reason, I conclude that there is good cause for keeping the documents under seal. The remaining two documents will not remain sealed. The first, Exhibit N to Temeyer's declaration, is entitled "employee change form" and does not contain any information that could conceivably be considered confidential. The second, Exhibit EE to Temeyer's declaration, is the Affidavit of Roy Desimone, which I discussed in connection with the ADA claim, above. Plaintiff also filed an identical copy of that same affidavit as Exhibit XX, yet Exhibit XX was not filed under seal. Because the affidavit is already available to the public as Exhibit XX, there is no reason to seal Exhibit EE.

### III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that the defendant's motion for summary judgment on the plaintiff's ADA claim (ECF No. 43) is **GRANTED.**

**IT IS FURTHER ORDERED** that the plaintiff's motion for leave to file an amended complaint withdrawing his FMLA claims (ECF No. 29) is **GRANTED**.

**IT IS FURTHER ORDERED** that the defendant's motion for summary judgment on the FMLA claims (ECF No. 22) is **DENIED**.

**IT IS FURTHER ORDERED** that the defendant's motion for sanctions (ECF No. 23) is **DENIED**.

**IT IS FURTHER ORDERED** that the plaintiff's motion to seal (ECF No. 53) is **GRANTED IN PART** and **DENIED IN PART**. The motion is granted to the extent that Exhibits K, L, and M to the Declaration of Kelly Temeyer may remain sealed. The motion is denied as to Exhibits N and EE.

**FINALLY, IT IS ORDERED** that the Clerk of Court shall enter final judgment.

Dated at Milwaukee, Wisconsin, this 12th day of November, 2015.

s/ Lynn Adelman
_____
LYNN ADELMAN
District Judge